IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Glen Hofmann, | : | |
| | : | Case No. 1:17-cv-143 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| Bethesda Foundation, Inc. *et al.*, | : | Part Motion for Summary Judgment |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 25).

Plaintiff Glen Hofmann, M.D., sues his former employers, Defendants Bethesda, Inc. d/b/a

Bethesda Fertility Center ("Fertility Center"), Bethesda, Inc., Bethesda Hospital, Inc., and

Bethesda Foundation, Inc. (collectively, "Bethesda") for discrimination after his employment

contract was not renewed.[1]  Bethesda argues that it is entitled to summary judgment on each of

Dr. Hofmann's claims as a matter of law.  For the reasons that follow, the Court will **GRANT**

**IN PART AND DENY IN PART** the Motion for Summary Judgment.

I.      BACKGROUND

A.      **Factual Background**

        1.      **Parties and General Background**

        Plaintiff Glen Hofmann, M.D., became medical director of the Fertility Center in 1992.

He also led the Bethesda Hospital's residency program for obstetrics and gynecology training for

---

[1] Bethesda, Inc. is a non-operational company that oversees the operations of the Fertility Center, the Bethesda
Foundation, and other related entities.

young doctors. Hofmann had employment agreements with Bethesda for the medical director position and for his work with medical residents. Bethesda is a part of TriHealth, but TriHealth does not directly manage the Fertility Center for religious reasons. At all times relevant here, the Fertility Center did not make money, but Bethesda operated it to provide a medical service to its patients and training for its residents. Dr. Hofmann and the Fertility Center had an excellent reputation in the community.

Mike Crofton was the TriHealth chief financial officer ("CFO"). He also served as a liaison between TriHealth and the Fertility Center, and he was Dr. Hofmann's direct supervisor at all relevant times. Jill Miller was the executive director of Bethesda, Inc. Mark Holcomb was the president and chair of the Board of Trustees of Bethesda, Inc. In 2010, Bethesda, Inc. hired the ScrogginsGrear Consulting firm to help manage the Fertility Center. Hofmann testified that ScrogginsGrear principal Paul Trenz handled contracts and important business decisions and his son, Luke Trenz, handled budgeting and accounting.[2]

## 2. Hiring of Dr. Reynolds, Retirement Questions, and Cancer

In February 2013, Dr. Hofmann emailed a former resident who had trained at the Fertility Center, Dr. Kasey Reynolds, to solicit her to return to the Fertility Center to practice the following year. (Doc. 13-2 at PageID 473–74.) In an email dated February 4, 2013, Dr. Hofmann stated as follows:

---

[2] Hofmann points to other evidence suggesting that Luke Trenz played a broader role in the management of the Fertility Center than simply budgeting and accounting. Either Paul Trenz or Luke Trenz attended monthly doctor-management meetings for the Fertility Center. (P. Trenz Dep., Doc. 19 at PageID 1220). Luke Trenz stated in an email to Hofmann that TriHealth had given ScrogginsGrear "the authority to manage the practice as [they saw] fit." (L. Trenz Dep., Doc. 16 at 741–42; Doc. 16-2 at PageID 849.)

> Your value first is as a woman. Hate that but it's true. Your best asset is that are bright and, and willing to work hard. That last asset is very hard to come and is gender neutral.

(*Id.* at PageID 472 (errors in the original).) Dr. Hofmann was a part of the team that hired Dr. Reynolds to the Fertility Center. (Hofmann Dep., Doc. 20 at PageID 1406.)

Also in February 2013, around the time the Fertility Center was recruiting Dr. Reynolds, Paul Trenz first asked Dr. Hofmann when he planned to retire. That same month, when Dr. Hofmann and Trenz were discussing the recent deaths of people they knew, Trenz commented that it showed "how we are all getting older." (*Id.* at PageID 1401.) Trenz then asked Dr. Hofmann again in November 2013 about his retirement plans. (*Id.* at PageID 1397–1400.) He told Dr. Hofmann that "the corporate people would probably just like to know, so they could give a young physician some idea as to what the older doctor was doing." (*Id.* at PageID 1398.) He stated that the Fertility Center wanted to be able to recruit for the future. (*Id.* at PageID 1402.)

In October 2013, Dr. Hofmann was diagnosed with non-Hodgkin's lymphoma. (*Id.* at PageID 1395.) He underwent active chemotherapy treatments for six months and then prophylactic chemotherapy treatments every two months for two years. (*Id.* at PageID 1467–68.) He never missed a day of work because of his cancer or the chemotherapy treatments. (*Id.* at PageID 1395.) Hofmann was in remission in September 2017 when he was deposed in this suit. (*Id.* at PageID 1396.) He stated that Paul Trenz commented one time about the fact that he had cancer, but he could not remember in what context the comment was made. (*Id.* at PageID 1469–70.)

In August 2014, Dr. Reynolds began as a staff physician at the Fertility Center. (Reynolds Dep., Doc. 13 at PageID 334, 336.)  According to Dr. Reynolds, Dr. Hofmann told her when she was first hired that he wanted to retire within two to three, or three to five years.  (*Id.* at PageID 356, 390.)  She testified that she was told that she eventually would become the medical director.  (*Id.* at PageID 357.)

### 3.     Retention of Employees and Changing Office Managers

In early 2015, TriHealth's human resources department conducted an investigation of employee retention and management practices at the Fertility Center because of concerns about high staff turnover.  (L. Trenz Dep., Doc. 16 at PageID 737.)  Eight employees had left the Fertility Center in an eighteen-month period.  (Doc. 14-6 at PageID 554.)  Linda Rozzi, a senior human resources consultant for TriHealth, recommended the study because of the turnover and because she received complaints about how Dr. Hofmann and Phyllis Bryant managed the clinic. (Rozzi Dep., Doc. 14 at PageID 508–09.)  Bryant had been the office manager at the Fertility Center since the 1990's.  (L. Trenz Dep., Doc. 16 at 734.)  Dr. Hofmann was her supervisor. (*Id.*)  Luke Trenz believed that she was not a strong office manager and that she was viewed as creating a toxic environment in the Fertility Center.  (*Id.* at PageID 735.)  He believed that Bryant and Dr. Hofmann reinforced each other's decisions in regards to staff management.  (*Id.* at PageID 737.)

In the retention report dated May 20, 2015, Rozzi noted that employees told her that "Bryant lacks conflict management skills and actually creates much of the conflict, breaches confidentiality with employees, interferes with/disrupts clinical operations and exhibits bullying types of behavior on a regular basis."  (Doc. 14-6 at PageID 557.)  She noted that employees

stated that Dr. Hofmann supported Bryant "in all her decisions and does not consider feedback from employees." (*Id.* at PageID 558.) Finally, she recommended terminating Bryant, but she did not recommend taking any disciplinary action against Dr. Hofmann. (*Id.*; Rozzi Dep., Doc. 14 at PageID 518.) Bryant was terminated from the Fertility Center. (Hofmann Dep., Doc. 20 at PageID 1415.) Dr. Hofmann opposed the decision to fire Bryant. (*Id.* at PageID 1416–17.) He testified that his employment contract gave him reasonable input on such decisions, but that he was not given reasonable input. (*Id.*)

Dr. Hofmann recommended that the Fertility Center hire Stacey Froehlich to be the new office manager. Froehlich had been the office manager for her husband's medical practice, and she and her husband were friends with Dr. Hofmann. (*Id.* at PageID 1415–16.) She was hired as the office manager in August 2015. (Froehlich Dep., Doc. 15 at PageID 575.)

### 4.     Conflicts at the Fertility Center and the Hiring of Dr. Robertshaw

Dr. Reynolds described Dr. Hofmann's treatment of the patients and staff at the Fertility Center, including her, as "disruptive." (Reynolds Dep., Doc. 13 at PageID 355.) She stated that Dr. Hofmann was aloof towards her and rebuffed her requests for mentorship. (*Id.* at PageID 356–57.) She stated that patients complained to her that Dr. Hofmann was "gruff" and "rude." (*Id.* at PageID 374–75.) She testified that he made clinically inappropriate comments about patients' body weight in front of staff and sometimes within earshot of patients, though she admitted that there is correlation between a patient's body weight and IVF success. (*Id.* at PageID 374–75, 377–79.) She did not report Dr. Hofmann's inappropriate comments regarding patients to the Trenzes, but she did tell Paul Trenz that he was difficult to work with. (*Id.* at

PageID 375–76.)  Dr. Hofmann, in turn, testified that Dr. Reynolds was "very moody" and "complain[ed] a lot."  (Hofmann Dep., Doc. 20 at PageID 1424.)

Dr. Reynolds was frustrated when she felt she was not progressing towards the goal of succeeding Dr. Hofmann as the medical director.  She testified that she asked Dr. Hofmann to start teaching and training her, but he did not.  (Reynolds Dep., Doc. 13 at PageID 383.)  In October 2015, Dr. Hofmann counseled Dr. Reynolds in an email for her failure to follow proper practices when meeting a new patient, including the failure to perform breast examinations on all patients.  (Doc. 19-1 at PageID 1335; Hofmann Dep., Doc. 20 at PageID 1424–26.)  She responded by requesting a meeting with Dr. Hofmann, Paul Trenz, and Luke Trenz to discuss that issue and what she saw as the stagnation in her progress towards taking the medical director role.  (Doc. 19-1 at PageID 1334–35; Reynolds Dep., Doc. 13 at PageID 357; Hofmann Dep., Doc. 20 at PageID 1424.)

Dr. Hofmann advised Paul Trenz and Luke Trenz that he did not believe that Dr. Reynolds was qualified to take over as the medical director at that time.  (Doc. 19-1 at PageID 1334.)  He thought that she wanted to be medical director because she was "cash-strapped" with "a new house and her student loans[,]" and she assumed the medical director position came with higher pay.  (Doc. 20 at PageID 1425.)  Dr. Hofmann testified that Paul Trenz told Dr. Reynolds at the meeting that she was not qualified to be the medical director because she was not yet board certified.  (*Id.* at PageID 1426–27.)  However, Paul Trenz testified at his deposition that he did not think he could make the judgment as to whether or not Dr. Reynolds was qualified to be the medical director because he was not a clinician.  (Doc. 19 at PageID 1246.)  He further testified that he understood from his discussions with Dr. Jack Basil, the obstetrics and gynecology

department chair for Good Samaritan and Bethesda North Hospitals, whose residents rotated through the Fertility Center, that being board certified was not a requirement for being medical director of the Fertility Center.  (*Id.* at PageID 1247; Doc. 18 at PageID 1125–26.)

Also in October 2015, the Fertility Center hired Dr. Isela Robertshaw to join the Fertility Center practice and begin working the following year on August 1, 2016.  (Doc. 19-1 at PageID 1331–1332; Doc. 19-4 at PageID 1356.)  When Dr. Robertshaw was hired, Dr. Hofmann indicated to Paul Trenz that he wanted to build the Fertility Center to a three-doctor practice.  (P. Trenz Dep., Doc. 19 at PageID 1244, 1252; Doc. 19-1 at PageID 1331; Hofmann Dep., Doc. 20 at PageID 1409–10.)  At that time, Crofton, Trihealth's CFO and Dr. Hofmann's direct supervisor, agreed that he anticipated that the Fertility Center would grow as a result of adding Dr. Robertshaw to the practice.  (Crofton Dep., Doc. 18 at PageID 1120–21.)  However, Crofton also testified at his deposition that the addition of Dr. Robertshaw helped establish a succession plan for when Dr. Hofmann decided to retire, but the retirement decision timeline was up to Dr. Hofmann.  (*Id.* at PageID 1121.)  The succession plan would be to maintain a two-doctor practice with Dr. Reynolds taking over as the medical director.  (*Id.* at PageID 1123.)  Dr. Pradeep Warikoo, the director of the Reproductive Studies Lab associated with the Fertility Center, also testified at his deposition that Luke Trenz and Paul Trenz had stated for ten years that they wanted the Fertility Center to be a two-doctor practice.  (Doc. 9 at PageID 64, 111.)

At the end of December 2015, Froehlich, the office manager, began to keep a journal log because she "was concerned about how the center [was] being run and the future of [its] patients."  (Doc. 15-5 at PageID 674–80.)  Froehlich made multiple entries in her journal log from December 2015 through March 11, 2016.  (*Id.*)  She documented incidents in which she

witnessed Dr. Hofmann being impatient with nurses and patients. (*Id.*) She also documented incidents where nurses complained to her about how Dr. Hofmann treated them and their patients. (*Id.*)

According to Froehlich, Dr. Hofmann would be "very angry" and "yell" at nurses who did not do what he wanted. (Doc. 15 at PageID 581.) She testified that when she told Dr. Hofmann that one set of patients was leaving the practice because of the way he treated them, Dr. Hofmann stated "bitch" in response. (*Id.* at PageID 590.) Dr. Hofmann, for his part, denied that he ever yelled at employees. (Doc. 20 at Page ID 1437, 1489.) He specifically denied using the term "bitch" to describe any patient or staff member. (Doc. 30-1 at PageID 1789.)

Nurse Amanda Wells testified at her deposition that Dr. Hofmann had a poor bedside manner and that he did not take the time to console or answer questions from patients who were upset. (Doc. 12 at PageID 279–85, 288.) She stated that he told overweight patients that they "were fat and needed to lose weight." (*Id.* at PageID 288, 290.)[3] She also complained that he "belittled" her and made her look "unknowledgeable" in front of patients and resident doctors. (*Id.* at PageID 286.) On February 2, 2016, Wells complained that when she was using a computer to schedule a patient over the phone, Dr. Hofmann interrupted her phone call, swatted her hand away from the computer mouse, closed the screen she was using, and used the computer to check his own schedule for the next day. (*Id.* at PageID 293–94.) Wells complained to Froehlich about Dr. Hofmann's actions and stated that she intended to resign. (Doc. 15-5 at PageID 676.) Froehlich and Wells told Dr. Hofmann that Wells had given her two-

---

[3] Dr. Hofmann explained that he often discussed obesity with patients because it negatively influences their chance of having a child and puts them at risk for complications if they become pregnant. (Hofmann Dec., Doc. 30-1 at PageID 1789–90.)

week notice.  ((Wells) Thomas Dep., Doc. 12 at PageID 304.)  His response was that they could

make "something good" out of her leaving by contacting "the two nurses from [another hospital]

that are looking for jobs."  (*Id.*)

When asked about Nurse Wells at his deposition, Dr. Hofmann stated that he had

attempted to correct Nurse Wells because "[s]he wasn't working with [him] in the care of

patients as she should have been."  (Doc. 20 at PageID 1435.)  He denied the accusation that he

swatted Nurse Wells's hand at any time as "[a]bsolutely false."  (*Id.* at PageID 1437.)

Also, on February 2, 2016, Froehlich logged complaints by Dr. Reynolds that Dr.

Hofmann mocked her, did not treat he with respect as a physician, and changed the treatment

protocol for her patients without consulting her.  (Doc. 15-5 at PageID 676.)  On February 3,

2016, Froehlich stated in the journal log that she felt torn because she respected Dr. Hofmann as

a person outside of the office, but she felt that she could "no longer sit back and watch as my

nurses and staff and patients and Dr. Reynolds be constantly disrespected and treated horribly."

(*Id.* at PageID 677.)  She reported her concerns about Dr. Hofmann to Linda Rozzi in HR.

(Froehlich Dep., Doc. 15 at PageID 633–34; Doc. 15-5 at PageID 677.)

On February 16, 2016, a meeting was held between Nurse Wells and Dr. Hofmann with

Dr. Reynolds, Dr. Warikoo, Froehlich, and Paul Trenz also participating.  Nurse Wells agreed to

stay with the Fertility Center, and Dr. Hofmann agreed to apologize to her.  (P. Trenz Dep., Doc.

19 at PageID 1299–1301; Doc. 19-4 at PageID 1353.)  Dr. Hofmann apologized to Nurse Wells,

stated that it had not been his intention to upset her, agreed they "needed to see some change in

how [they] interacted," and agreed to Nurse Wells's reasonable requests regarding her job

parameters.  (Hoffman Dep., Doc. 20 at PageID 1436.)  Also at the meeting, the participants

informed Dr. Hofmann about incidents in which he made staff and patients feel uncomfortable by his comments.  (P. Trenz Dep., Doc. 19 at PageID 1300–01; Doc. 19-4 at PageID 1353.)  Paul Trenz did not question the legitimacy of the complaints made against Dr. Hofmann, because the allegations were consistent with one another.  (Doc. 19 at PageID 1301.)  The participants, including Dr. Hofmann, discussed transitioning the practice from Dr. Hofmann to Dr. Reynolds and Dr. Robertshaw.  (*Id.* at PageID 1302; Doc. 19-4 at PageID 1353.)  Paul Trenz told Dr. Hofmann to mentor Dr. Reynolds for the medical director position.  (P. Trenz Dep., Doc. 19 at PageID 1302; Doc. 19-4 at PageID 1353.)

### 5.  Non-Renewal of Dr. Hofmann's Contract

Dr. Hofmann's employment contract automatically renewed on July 1, 2016 unless either party gave written notice of nonrenewal at least ninety days in advance.  (Doc. 20-2 at PageID 1527–28.)  In October 2015, Paul Trenz told Dr. Hofmann his employment contract would be renewed in July 2016 unless he violated the contract before then, but also that he could not plan on practicing at the Fertility Center for five more years.  (Doc. 19-1 at PageID 1332.)  He recounted his conversation with Dr. Hofmann to Dr. Reynolds in an email dated October 21, 2015:

> The meeting went well.  Luke [Trenz] and I told Glen [Hofmann] that his contract will be renewed next July unless he violates it in some way.  Also, I told him that he cannot plan on being here for 5 more years.  This is only going to be a two doctor practice and we are moving to a new generation.  I did not say more than that except I thought he would still have a contract in two years.

(*Id.*)

Early in 2016, Jill Miller, then the executive director of Bethesda, Inc., had discussions with Paul Trenz, Luke Trenz, and Mark Holcomb, the president and chair of the Board of

Trustees for Bethesda, Inc., about the plan for renewing Dr. Hofmann's contract. Luke Trenz testified that as of January 2016 Defendants intended to renew Dr. Hofmann's contract, but for the purpose of having him mentor the two younger doctors and then transition to retirement. (Doc. 16 at PageID 779.) He implied in an email dated January 11, 2016 to Paul Trenz and Miller that Dr. Warikoo and Dr. Basil believed that Dr. Hofmann "appear[ed] to be losing an edge clinically (more conservative than he has been in the past)" and that it might be hard to grow the Fertility Center if he was "still a key component." (Doc. 16-5 at PageID 853.) However, at his deposition, Dr. Warikoo denied telling anyone that Dr. Hofmann was losing his edge or making it hard to grow the Fertility Center. (Doc. 9 at PageID 90, 97.) He testified that he might have expressed a concern about the falling fertility rate for the clinic. (*Id.* at PageID 97.) Dr. Basil testified that he was not sure exactly what Paul Trenz meant or on what basis he had formed the opinion that Dr. Hofmann was becoming less aggressive in his treatment of patient infertility. (Doc. 11 at PageID 217.)

By February 1, 2016, Paul Trenz and Crofton, Dr. Hofmann's immediate supervisor, agreed to offer Dr. Hofmann a one-year contract extension with no promises for a second year. (Miller Dep., Doc. 17 at PageID 978; Doc. 17-2 at PageID 1044.) Miller believed that Dr. Hofmann would be given the extension with an understanding that he would retire by mid-2018. (Doc. 17 at PageID 968; Doc. 17-1 at PageID 1041.) On March 2, 2016, Paul Trenz emailed Crofton about renewing the contracts for Dr. Hofmann and Dr. Reynolds. Trenz told Crofton that he had told Dr. Hofmann he likely would transition to working part-time in August 2017. Trenz anticipated that Dr. Hofmann would retire in July 2018, but he admitted to Crofton that he

had not told Dr. Hofmann that was his plan. (P. Trenz Dep., Doc. 19 at PageID 1310–11; Doc. 19-4 at PageID 1356.)

One factor in the contract salary negotiations for Dr. Hofmann was that Dr. Reynolds was pregnant and expected to go on maternity leave from early August to early November 2016. Dr. Hofmann did not want to take a pay cut starting in August 2016 because, even though Dr. Robertshaw would be joining the practice at that time, Dr. Hofmann thought his work hours would increase during Dr. Reynolds's maternity leave. (P. Trenz Dep., Doc. 19 at PageID 1308–13; Doc. 19-4 at PageID 1356.)

During a Fertility Center staff meeting on March 4, 2016, Dr. Hofmann stated that he had felt stressed and depressed, and he apologized if had been behaving poorly. (Froehlich Dep., Doc. 15 at PageID 650; Doc. 15-5 at PageID 678; Reynolds Dep., Doc. 13 at PageID 456.) Dr. Hofmann stated at the meeting that TriHealth only operated the Fertility Center to provide training for its resident doctors. (Miller Dep., Doc. 17 at PageID 935.) According to Froehlich, Dr. Hofmann stated that he could no longer care about the Fertility Center because TriHealth did not care about it. (Doc. 15 at PageID 650; Doc. 15-5 at PageID 678.) At his deposition, Dr. Hofmann first denied stating that TriHealth did not care about the Fertility Center, but he then admitted that he probably did say it. (Doc. 20 at PageID 1439–40.) He also admitted to saying that he "couldn't care about the things that [he] couldn't control." (*Id.* at PageID 1440–41.)

On March 15, 2016, Froehlich gave her journal log to Paul Trenz, which included notes about Dr. Hofmann's "don't care" comments. (Doc. 15 at PageID 645.) Trenz shared the journal log with Crofton. (Crofton Dep., Doc. 18 at PageID 1142.) A decision was made to not

renew Dr. Hofmann's employment contract after he made the "don't care" comments, but accounts vary as to who made the decision and why.

Holcomb, the president and chair of the Board of Trustees of Bethesda, Inc., testified that he was not involved in the decision to not renew Dr. Hofmann's contract and that he did not know who made the decision.  (Doc. 27 at PageID 1705.)  He believed the decision was made by human resources based on well-documented incidents of Dr. Hofmann creating a hostile environment.  (*Id.* at PageID 1705–13.)  He did not talk to anyone in human resources about the decision to not renew Dr. Hofmann.  (*Id.* at PageID 1711, 1714.)

Miller, the executive director of Bethesda, Inc., testified in her deposition that the decision to not renew was made by Paul Trenz, Holcomb, and Crofton, Dr. Hofmann's direct supervisor.  (Doc. 17 at PageID 927–28.)  She stated that Paul Trenz did not have authority on his own to terminate Dr. Hofmann's contract because Bethesda, Inc. ultimately had control over the Fertility Center.  (*Id.* at PageID 943.)  She denied that she played a role in the decision, but she did participate in discussions about Dr. Hofmann's inappropriate behavior.  (*Id.* at PageID 925–28.)  She believed the decision was made because of Dr. Hofmann's behavior towards staff and patients and because he told the staff that TriHealth did not care about them.  (*Id.* at PageID 935, 943.)  She stated that Paul Trenz told her that Dr. Basil thought it was time for Dr. Hofmann to leave Bethesda.  (*Id.* at PageID 977.)

Crofton testified at his deposition that he helped make the decision to not renew Dr. Hofmann with Miller, Holcomb, and Paul Trenz.  (Crofton Dep., Doc. 18 at PageID 1087, 1138–39.)  Crofton agreed with the termination decision based on the reports he read about Dr. Hofmann's behavior in emails and from Froehlich's journal log, not based on personal

knowledge.  (*Id.* at PageID 1138–39, 1142.)  Crofton did not do any personal investigation of whether the complaints about Dr. Hofmann's behavior were true.  (*Id.* at PageID 1143.)  He believed that the Fertility Center had lost key nurse employees because of Dr. Hofmann's behavior towards them.  (*Id.* at PageID 1093.)

Paul Trenz testified that Crofton, Holcomb, Miller, and Donna Nienaber, the general counsel for TriHealth, helped make the decision.  (Doc. 19 at PageID 1242, 1317.)  He agreed that he gave input into the decision.  (*Id.* at PageID 1242.)  He stated the decision was made because Dr. Hofmann made inappropriate comments to patients and staff, he believed that TriHealth did not care about the Fertility Center, and he hurt the Fertility Center's "ability to retain staff."  (*Id.* at PageID 1315.)  He testified that he was not concerned when Dr. Hofmann told him privately that TriHealth did not care about the Fertility Center, but he was concerned that Dr. Hofmann had made similar comments to doctors and staff.  (*Id.* at PageID 1305.)

Luke Trenz believed that Miller and Holcomb made the decision not to renew Dr. Hofmann's contract.  (L. Trenz Dep., Doc. 16 at PageID 836.)

On March 23, 2016, Paul Trenz met with Dr. Warikoo, Dr. Reynolds, Dr. Robertshaw, and Froehlich to inform them that a decision had been made not to renew Dr. Hofmann's contract.  (Warikoo Dep., Doc. 9 at PageID 100–02; Reynolds Dep., Doc. 13 at PageID 398; Robertshaw Dep., Doc. 28 at PageID 1766–68.)  Paul Trenz testified that he told the doctors and Froehlich that Dr. Reynolds would be the new medical director and Dr. Robertshaw would be the second doctor.  (Doc. 19 at PageID 1320.)

On March 28, 2016, Crofton, Paul Trenz, and Darla Olson presented Dr. Hofmann with the notice of non-renewal of his contract.  (Crofton Dep., Doc. 18 at PageID 1086–87, 1090.)

According to Dr. Hofmann, Paul Trenz told him at the meeting that they had "two young doctors that will carry the practice on when [he was] gone." (Doc. 20 at PageID 1446.) Dr. Hofmann was terminated that day for practical purposes because they honored the ninety days remaining on his current contract by paying him not to work. (*Id.* at PageID 1445.)

Dr. Hofmann believed the decision was made to terminate him because he was sixty-five years old, the Fertility Center had two younger, female doctors to take his place, and he had cancer. (*Id.* at PageID 1465.) He stated that Bethesda had incurred $470,000 in health care costs for his cancer treatments. (*Id.* at PageID 1464.) However, he admitted that no one at Bethesda or TriHealth made comments to him about the cost of his cancer treatment. (*Id.* at PageID 1468.) He also admitted that no one made derogatory comments to him about the fact that he was a male physician. (*Id.* at PageID 1475.)

Dr. Reynolds testified that she became the medical director for the Fertility Center in March 2016. (Doc. 13 at PageID 336.) She then went out on a disability leave for twenty-two weeks related to the birth of her twin children starting on May 1, 2016. (*Id.* at PageID 353–54, 359.) Dr. Robertshaw began working at the Fertility Center on July 28, 2016. (Robertshaw Dep., Doc. 28 at PageID 1746.)

**B.**     **Procedural Posture**

Dr. Hofmann filed a Complaint on March 6, 2017, and then he filed an Amended Complaint on November 29, 2017 against Defendants asserting seven causes of action: (1) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"); (2) age discrimination in violation of Ohio Revised Code chapter 4112; (3) disability discrimination in violation of the American with Disabilities Act Amendments Act ("ADAAA"); (4) disability

discrimination in violation of Ohio Revised Code chapter 4112; (5) gender discrimination in violation of Title VII, 42 U.S.C. 2000e, *et seq.*; (6) gender discrimination in violation of Ohio Revised Code chapter 4112; and (7) interference and retaliation under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132 and 1140.  (Doc. 7 at PageID 44–48.)

Following discovery, on May 21, 2018, Defendants filed their Motion for Summary Judgment on all claims asserted against them.  (Doc. 25.)  Dr. Hofmann opposes the Motion for Summary Judgment except as to the ERISA interference and retaliation claim.  (Doc. 32 at PageID 1815 n.1.)  The Motion for Summary Judgment is fully briefed and ripe for adjudication.

## II.  STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. ANALYSIS

### A. Age Discrimination

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). Ohio's anti-discrimination statute also prohibits employment discrimination on the basis of age. Ohio Rev. Code § 4112.02(A). Ohio law parallels the ADEA, and the Court will analyze the federal and state discrimination claims together. *See Whitt v. Lockheed Martin Utility Serv., Inc.*, 209 F. Supp. 2d 787, 792 (S.D. Ohio 2002); *Plumbers & Steamfitters Jt. Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 421 N.E.2d 128, 131 (1981).

To set forth a prima facie case of age discrimination using circumstantial evidence, a plaintiff must establish the four elements of the well-known *McDonnell Douglas* test: (1) that he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that he was replaced by someone outside of the protected class, was treated less favorably than a similarly-situated individual outside his protected class, or that other circumstances exist that support an inference of discrimination. *See, e.g.*, *Blizzard v. Marion Tech. College*, 698 F.3d 275, 283 (6th Cir. 2012) (listing "circumstances that support an inference of discrimination" as final factor); *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009) (listing "he was replaced by someone outside of the protected class" as the final factor).

If the plaintiff meets his prima facie case, the burden of production shifts to the employer to provide a legitimate nondiscriminatory reason for his termination. Then the plaintiff must rebut the employer's argument by introducing evidence of pretext. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). "The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard*, 698 F.3d at 285 (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "[T]he trier of fact may . . . consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

"[A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." *Chen*, 580 F.3d at 400 n.4. In an age discrimination case, that requires showing that age was the but-for cause of adverse employment action. *Diebel v. L&H Resources, LLC*, 492 F. App'x 523, 527 (6th Cir. 2012).

Although the facts in this case are lengthy and somewhat complex, the analysis necessary to conclude that Defendants are not entitled to summary judgment on the age discrimination claims is fairly straightforward. Starting with Dr. Hofmann's prima facie case, Defendants do not dispute that Dr. Hofmann is over age forty, that he suffered an adverse employment decision, or that he was qualified for his position with the Fertility Center. Defendants challenge only whether Dr. Hofmann can offer evidence of other circumstances that support an inference of age discrimination. Dr. Hofmann argues that a reasonable jury could conclude based on the evidence presented that he was replaced by Dr. Reynolds, a younger doctor as the medical director or as the more senior doctor in a two-doctor practice. Defendants argue in rebuttal that Dr. Hofmann was not replaced because existing employees, primarily Dr. Reynolds, simply absorbed his duties. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." (citation omitted)).

There is sufficient evidence at the prima facie stage to find that Dr. Reynolds replaced Dr. Hofmann. To begin, Dr. Reynolds testified that she was told when she was hired that she eventually would become the medical director of the Fertility Center. She further testified that she became medical director in March 2016, the month Dr. Hofmann was terminated. Paul

Trenz, likewise, told Froehlich, Dr. Warikoo, Dr. Reynolds, and Dr. Robertshaw that Dr. Reynolds was taking over the medical director position at the meeting where he announced the non-renewal of Dr. Hofmann's contract. This creates at least a disputed material question of fact whether Dr. Reynolds replaced Dr. Hofmann as the medical director. Furthermore, given the statements by Paul Trenz and Crofton that they anticipated that the Fertility Center would remain a two-doctor practice in the long term even after Dr. Robertshaw was hired, there is a disputed material question of fact whether Dr. Reynolds replaced Dr. Hofmann as the senior doctor in a two-doctor practice with Dr. Robertshaw becoming the junior doctor.

Because Dr. Hofmann can meet his prima facie burden, the burden of production shifts to Defendants. Defendants offer at least two legitimate nondiscriminatory reasons that they decided not to renew Dr. Hofmann's contract: (1) Dr. Hofmann stated that TriHealth did not care about the Fertility Center, and therefore, he could not care either, and (2) he mistreated patients and other staff members. Although Defendants only have a burden of production, they offer evidence in support of these reasons, including the testimony of non-decisionmakers such as Nurse Wells and Froehlich, the office manager. The burden of persuasion, therefore, shifts back to Dr. Hofmann to establish the proffered reasons are pretext. Dr. Hofmann offers evidence that the Defendants' stated reasons were not the actual reason his contract was not renewed.

To begin, Defendants present varying and even conflicting stories as to who made the decision to not renew Dr. Hofmann's contract and why the decision was made. Miller, the executive director of Bethesda, Inc., denied making the decision not to renew the contract, but Crofton, Paul Trenz, and Luke Trenz all testified that she helped make the decision. Holcomb,

the president and chair of the Board of Trustees for Bethesda, similarly testified that he did not participate in the decision, but Miller, Crofton, Paul Trenz, and Luke Trenz all stated that he did.

Also, management employees gave varying reasons for not renewing Dr. Hofmann's contract, and those reasons are not fully supported. Luke Trenz reported that Dr. Warikoo and Dr. Basil both believed that Dr. Hofmann was losing his clinical edge and becoming less aggressive in using fertility treatments, but neither doctor supported Trenz's statements about Dr. Hofmann during their depositions. Crofton and Paul Trenz both identified a fear that the Fertility Center was losing key staff as a reason for the non-renewal, but they did not identify any staff who left after Phyllis Bryant, the former office manager, was terminated in mid-2015 pursuant to the recommendations of the employee retention report. Crofton and Holcomb both relied on the secondhand reports that Dr. Hofmann made inappropriate comments to patients and nurses, but neither confirmed the accuracy of the reports themselves. Evidence that a decision was not reasonably informed and thoughtfully considered can be evidence of pretext. *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009). Moreover, inconsistencies as to who made an adverse employment decision and why can "demonstrate that there is a genuine issue of material fact regarding [the employer's] proffered reason" for the decision. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997); *see also Laws v. HealthSouth N. Ky. Rehab. Hosp. Ltd. Ptshp.*, 508 F. App'x 404, 440 (6th Cir. 2012) ("shifting explanations and justifications" for a termination are probative of pretext).

Also, there is evidence in the record that Bethesda intended to transition the practice to Dr. Reynolds and Dr. Robertshaw. Crofton, Luke Trenz and Paul Trenz envisioned the Fertility Center as a two-doctor practice for the long-term, even after they committed to hire Dr.

Robertshaw to join Dr. Hofmann and Dr. Reynolds in the practice. Miller and Paul Trenz anticipated that Dr. Hofmann would retire or be forced to retire after he helped train Dr. Robertshaw for one or two years. Also, Paul Trenz repeatedly asked Dr. Hofmann to give him a retirement timeline. Finally, Dr. Hofmann testified that Paul Trenz told him that two "young doctors" would carry on the Fertility Center after he was gone.

On the other hand, Defendants likely will argue that the evidence suggests that Defendants did not want to terminate Dr. Hofmann as early as March 2016. They will argue that it made little sense to terminate Dr. Hofmann at that time before Dr. Robertshaw joined the Fertility Center and when Dr. Reynolds had to go on maternity leave. At this summary judgment stage, the Court concludes only that Dr. Hofmann has presented sufficient evidence upon which a reasonable jury could find that Defendants' stated reasons for not renewing Dr. Hofmann were mere pretext for age discrimination. The Court will deny summary judgment to Defendants on the age discrimination claims.

**B.      Sex Discrimination Claims**

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Ohio's anti-discrimination statute also prohibits employment discrimination on the basis of sex. Ohio Rev. Code § 4112.02(A). The Court will analyze the federal and state discrimination claims together. *See Woods v. FacilitySource, LLC*, 640 F. App'x 478, 483 (6th Cir. 2016) (stating that the Title VII case law and framework also are applied to Ohio Revised Code chapter 4112 claims).

The analysis of the prima facie case for sex discrimination largely tracks the analysis of the prima facie case for age discrimination. A reasonable jury could conclude on the evidence provided that Dr. Hofmann is male, qualified for his position, suffered an adverse employment decision, and was replaced by a female doctor. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016) (listing elements of Title VII prima facie case). However, because Dr. Hofmann is male and seeking to prove reverse discrimination, he "must demonstrate background circumstances which support the suspicion that the defendant is the rare employer who discriminates against the majority." *Hertenstein v. W.-S. Fin. Grp.*, No. 1:06-CV-273, 2007 WL 4365412, at *6 (S.D. Ohio Dec. 11, 2007); *see also Turner v. Grande Pointe Healthcare Community*, 631 F. Supp. 2d 896, 911 (N.D. Ohio 2007) (applying this factor in a reverse gender discrimination case).

Dr. Hofmann relies only on his own belief that female patients seeking gynecology services might be more comfortable with female doctors to prove the background circumstances factor. He testified as follows at his deposition:

> [M]ost of what we do is vaginal, and if you have to think of a place where a woman finds things more sacred, that's where it's at. So if experience were equal, I think a lot of women would prefer to have a woman caring for them.

(Hofmann Dep., Doc. 20 at PageID 1474–75.) However, he does not support that belief with statistical or even anecdotal evidence. He provides no evidence that anyone at Bethesda shared his beliefs. Finally, he conceded that no one at Bethesda made any derogatory remarks about the fact that he was male, that he did well in his practice for years, and that his gender was not an issue in getting patient referrals. (*Id.* at PageID 1474–75.) The Court concludes that

Dr. Hofmann's subjective beliefs are not sufficient to create a genuine issue of material fact as to whether Bethesda is the atypical employer that discriminates against men.

Accordingly, Dr. Hofmann has failed to support a prima facie case of sex discrimination. The Court will grant summary judgment to Defendants on the sex discrimination claims.

## C.    Disability Claims

The ADA, as amended in the ADAAA, provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Likewise, Ohio's anti-discrimination statute also prohibits employment discrimination on the basis of disability. Ohio Rev. Code § 4112.02(A). Because the federal and state statutes contain similar prohibitions, courts rely on interpretations of the ADA as persuasive authority in interpreting Ohio's disability discrimination law. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206–07 (1998).

The familiar burden-shifting scheme of *McDonnell Douglas* applies to the disability discrimination claims as well. *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011). A disability discrimination plaintiff must support the following elements of a prima facie case:

> 1) [H]e or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Id.* (internal quotation and citation omitted); *see also Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016) (same). Ultimately, the plaintiff has the burden to show that the disability is the but-for cause for the adverse employment decision. *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012).

Defendants do not challenge that Dr. Hofmann can offer sufficient evidence to establish that he was disabled in that he had cancer,[4] that Bethesda knew he was disabled, that he was qualified for his position, and that he was subjected to an adverse employment action. Defendants, nonetheless, make two arguments that Dr. Hofmann cannot make a prima facie case of disability discrimination. First, Defendants again argue that Dr. Hofmann was not replaced, but the Court already has concluded that there is a disputed question of material fact whether Dr. Reynolds replaced Dr. Hofmann as the medical director of the Fertility Center or as the senior doctor in a two-doctor practice.

Second, Defendants assert that Hofmann testified that he was fired not because he had cancer, but because of the $470,000 cost of his cancer treatment. However, there is no evidence that Defendants knew the cost of his cancer treatment and terminated Hofmann on that basis. Also, to the extent that Defendants suggest that discrimination based on health care costs is not disability discrimination, case law does not support that argument. *See*, *e.g.*, *Giles v. Transit Employees Fed. Credit Union*, 794 F.3d 1, 14 (D.C. Cir. 2015) (refusing to resolve conflict between district court and courts in other jurisdictions on the issue); *Patmythes v. City of*

---

[4] Dr. Hofmann suggests for the first time in the Memorandum in Opposition that he was regarded as depressed by Bethesda and that the depression also qualified as a disability. Dr. Hofmann alleged in the Complaint only that he suffered from cancer. He cannot change the theory supporting his claim for the first time during the summary judgment briefing without having given notice to Defendants.

*Janesville*, 181 F. App'x 596, 598–99 (7th Cir. 2006) (finding that evidence that an employer terminated an employee with cystic fibrosis to reduce health care costs was evidence of ADA discrimination); *South v. NMC Homecare*, *Inc.*, 943 F. Supp. 1336, 1341 (D. Kan. 1996) (stating that discrimination based on health care costs for an impairment which does not substantially limit a major life activity, and therefore is not a disability, does not implicate the ADA). Moreover, the Court finds that Hofmann testified both that his disability claim was based on both the fact that he had cancer and the costs of his cancer treatments. (Doc. 20 at PageID 1464–70.) The Court finds that Hofmann has established a prima facie case of disability discrimination.

The legitimate nondiscriminatory reason and pretext analysis are the same as for the age discrimination claim. The inconsistencies as to what managers made the decision to not renew Dr. Hofmann's contract and why, and the evidence that Crofton and the Trenzes envisioned a two-doctor practice even after a third doctor was hired, still is relevant evidence that Defendants' stated reasons were pretextual. Accordingly, the Court will deny summary judgment to Defendants on the disability discrimination claim.

**D.     ERISA Claims**

Dr. Hofmann does not oppose the Motion for Summary Judgment as to the ERISA claims. (Doc. 32 at PageID 1815 n.1.) Accordingly, the Court will grant Defendants summary judgment on the ERISA claims.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  Summary judgment is granted to Defendants on the sex discrimination and ERISA claims, but denied as to the age and disability discrimination claims.

**IT IS SO ORDERED.**

Dated this 28th day of August, 2018.

BY THE COURT:


S/Susan J. Dlott
Susan J. Dlott
United States District Judge